## Covill *vs.* Hill & Sanford.

Mere possession of personal chattels, without some other evidence of property or of authority from the owner to sell, will not enable the possessor to transfer a better title than he has himself. *Per* Bronson, C. J.

Accordingly, where the plaintiff, having lumber lying on the bank of the canal, agreed with P. that he might ship the same in the plaintiff's name, to the defendants at Albany to sell, and that when sold the plaintiff should receive a certain sum per thousand feet, and P. the balance of the proceeds—the title and possession to remain in the plaintiff till he was fully paid ; *held* that the transaction was only a bailment by the plaintiff to P. And he having shipped the lumber to Albany in the plaintiff's name, and assumed to sell it to the defendants ; *held further*, that no title passed to them.

*Held also*, that P. was not, under the facts stated, *a factor entrusted with the possession of the property for sale*, so as to be deemed the true owner, in order to protect persons purchasing from him, as provided by the third section of the *act relative to principals and factors or agents.* (*Stat.* 1830, *p.* 203.)

The *first* section of that act, providing that persons in whose name property is shipped shall be deemed the true owners thereof, so far as to secure consignees for advances thereon, applies only to cases where the shipment in the name of another person is made by, or with the consent of, the owner.

Therefore, where property is entrusted to an agent to ship in the owner's name, and he ships it in his own, and obtains advances thereon, the consignee making such advances is not protected.

The character and terms of a *bill of lading* stated. *Per* Bronson, C. J.

A paper signed only by the consignor, stating the s' ɔment, and entrusted to the master, is not a bill of lading.

Covill *v.* Hill.

Where the master, upon receiving property on board, signs and delivers to the owner a regular bill of lading, he cannot afterwards prejudice such owner by executing another bill of lading acknowledging the property to have been shipped by another party. *Per* BRONSON, C. J.

TROVER for a quantity of white pine lumber, tried at the Chemung circuit in May, 1844, before MONELL, Cir. J. The jury found a special verdict, stating the facts substantially as follows. On the 6th of December, 1841, the plaintiff and Bradford A. Potter entered into a written contract, stating that Potter had that day purchased of the plaintiff all his white pine boards and plank at his two saw mills, amounting in quantity to about 200,000 feet, at $8,25 per thousand, to be delivered at two specified points on the bank of the Chemung canal, before the opening of canal navigation in the spring of 1842. When the lumber should be placed on the bank of the canal by the plaintiff, Potter was to deliver to the plaintiff his draft on Messrs. Hill & Sanford, (the defendants,) payable on the first of April, 1842, for an amount sufficient, at $8,25 per thousand, for the whole quantity so delivered. The lumber was to remain in the possession of the plaintiff ntil the draft on the defendants should be accepted, and re irned from Troy to the plaintiff.

On the first of July, 1842, the pla tiff and Potter entered into a second written contract, recitin the former agreement; and reciting also that the plaintiff h d, in pursuance of that agreement, placed the lumber, which a iounted to 173,000 feet, on the banks of the canal; that Pott had not performed the agreement by giving a draft on the efendants; nor had he paid the plaintiff any thing for the lu ber; that the plaintiff therefore still retained possession; ai that the parties were desirous that the lumber should be t en to market and sold. It was then agreed between them, tha Potter should, on that day, pay the plaintiff $2. per thousanc eet on the lumber, and *the plaintiff should hold the title and* ssession of the lumber *until he should be paid the full amoui* of the purchase money, with interest from the first of April t n last. It was further agreed that Potter, *as the agent and* the name of the plain-

tiff, should ship the lumber to the defendants at Albany, Potter paying freight, to be sold by the defendants *as the property of the plaintiff,* and *the avails thereof,* to the amount of the residue of the purchase money and interest to *be accounted for and paid by the defendants to the plaintiff.*

The day following this agreement, Potter, by his son and agent A. F. Potter, shipped on board the canal boat Occidental, H. Banks master, 52,900 feet of the lumber, to be delivered to the defendants at Albany; paid $100 towards the freight, and took from the master, *and delivered to the plaintiff,* a bill of lading as follows: "Received of A. F. Potter *for Miles Covill,* 5?,900 feet of boards and plank in good order, to be delivered to Messrs. Hill & Sanford, Albany: also one hundred dollars on freight. July 2, 1842. (Signed) H. Banks." A. F. Potter made out and delivered to Banks, the master, a writing which the special verdict calls a bill of lading, as follows: "Elmira, July 2, 1842. Shipped on boat Occidental, H. Banks, cap-tain, 52,900 feet white pine boards and plank for Albany (Signed) A. F. Potter." *No bill of lading was sent to the defendants.* A. F. Potter, for his father, drew on the defendants as follows: "Messrs. Hill & Sanford, please pay Capt. H. Banks, boat Occidental, four dollars per thousand feet for lumber, deducting $100 advanced. (Signed) B. A. Potter, per A. F. Potter."

On the 16th day of July Capt. Banks delivered the lumber to the defendants at Albany, and at the same time delivered the bill of lading and draft given by A. F. Potter; and the defendants paid the balance of freight, amounting to $109. On the same day the defendants remitted to B. A. Potter, by mail, their acceptance for $250, as an advance on the lumber. The $100 which A. F. Potter paid towards the freight was also the money of the defendants.

Potter never paid the plaintiff any thing for the lumber ex-cept the sum of $46. On the 15th of August, 1842, the plain-tiff sent to the defendants to make inquiries about the lumber. The defendants answered, that B. A. Potter was largely in-debted to them, and they had given him credit for the lumber

on account of such indebtedness. The defendants were thereupon informed that the lumber belonged to the plaintiff, was shipped by Potter for the plaintiff, to be sold by the defendants for the plaintiff. On the 22d of August, the plaintiff wrote the defendants, insisting that the lumber was his property, and desiring the defendants to sell it for him at not less than a specified sum. The defendants answered, that the lumber was shipped as Potter's property, and placed to his credit. The plaintiff replied, forbidding the defendants to dispose of the lumber as the property of Potter. After a rejoinder by the defendants, the plaintiff demanded the lumber of the defendants, offering to pay them freight and all other charges. The defendants refused to deliver the lumber, unless the plaintiff would also pay the advances which the defendants had made to Potter, independent of expenses for transportation, amounting, as they alleged, to several hundred dollars. The defendants sold the lumber before this action was brought.

From 1828 to 1842 B. A. Potter was engaged in the lumber business, which has amounted to forty or fifty thousand dollars a year. The lumber in question was shipped from his yard in Elmira. He both manufactured and purchased lumber; and uniformly shipped lumber to be sold on his own account. He was, during that period, in the habit of shipping lumber to the defendants, who were lumber dealers in Albany, to be sold on his account. The lumber so consigned to the defendants amounted to from five to $50,000 per year. The course of business was for him to forward lumber to the defendants, and make drafts upon them on account of it. In 1838, Potter confessed a judgment of $5000 to the defendants to indemnify them for advances. At the time of the receipt of the lumber in question, he owed the defendants more than $5000, over and above all property of his in their hands.

The jury assessed the plaintiff's damages contingently at $500. The special verdict concluded in the usual form

*N. Hill, Jr.* for the plaintiff, cited 2 *Hill,* 324   2 *Pick.* 512; 20 *Wend.* 267; 15 *id.* 474; 11 *id.* 80.

Covill *v.* Hill.

*I. Harris,* for the defendants, cited *Stat.* 1830, *p.* 203; 6 *Hill,* 512 ;(*a*) 13 *Wend.* 572; 20 *id.* 279; 15 *East,* 38.

*By the Court,* BRONSON, Ch. J. It is a principle of the common law, which has but few exceptions, that a man cannot be divested of his property without his consent. And although possession is one of the most usual evidences of title to personal chattels, yet, as a general rule, mere possession wil. not enable a man to transfer a better title than he has himself or than he has been authorized by the owner to grant. Exceptions in favor of trade are allowed in the case of money and negotiable instruments. But as to other personal chattels, the mere possession, by whatever means it may have been acquired, if there be no other evidences of property, or authority to sell from the true owner, will not enable the possessor to give a good title. In *Pickering* v. *Busk,* (15 *East,* 38,) which is one of the strongest cases in the books against the true owner, the broker not only had the possession of the hemp, but it had been transferred to his name in the books of the wharfinger by direction of the owner; and from this evidence, in connection with the fact that it was the ordinary business of the broker to make sales, an authority from the owner to sell was implied. So far has the rule for protecting the owner been carried, that although he sell and deliver possession of the property, if there be a condition that the title shall not pass until the price is paid, the voluntary assignee of the purchaser will acquire no right as against the owner. (*Haggerty* v. *Palmer,* 6 *John. Ch.* 437.) Nor will the creditors of the vendee acquire any such right, by receiving the property on account of their debts, or taking it by virtue of their executions or attachments. (*Strong* v. *Taylor,* 2 *Hill,* 326; *Hussey* v. *Thornton,* 4 *Mass.* 405; *Marston* v. *Baldwin,* 17 *id.* 606; *Barrett* v. *Pritchard,* 2 *Pick.* 512. *And see Root* v. *French,* 13 *Wend.* 570.) But in the case of a conditional sale, with a delivery of possession, it

---

(*a*) Affirmed on error, (3 *Denio,* 472.)

Covill *v.* Hill.

may be that a *bona fide* purchaser, who parts with his money; or one who makes advances to the vendee on the property, trusting to the credit of appearances, will obtain a good title or lien; on the principle which is sometimes applied, that when one of two innocent persons must suffer from the fraud of a third, the loss shall fall on him who has enabled such third person to do the wrong. (*See Haggerty* v. *Palmer*, 6 *John. Ch.* 437; *Root* v. *French*, 13 *Wend.* 570; 2 *Kent*, 497.) But it is not now necessary to decide that question; for there was no conditional sale, nor a sale of any kind from the plaintiff to Potter. The title was never to vest in Potter; but only in such persons as should purchase from the defendants, to whom the lumber was to be shipped, and who were to sell it as the property of the plaintiff, and account to him for the avails, to the extent provided for by the contract. The plaintiff was to hold the possession as well as the title to the property until the purchase money should be paid. And although Potter was to ship the lumber to the defendants, he was to do it as the agent, and in the name of the plaintiff. The transaction amounted to nothing more than a bailment of the lumber to Potter for the purpose of forwarding it to the defendants to be sold, with an interest in the bailee as to all which the property might bring beyond the specified sum of $8,25 per thousand feet. Potter had no more power over the property as against the plaintiff, than though he had received it as a common carrier for hire, and without any other interest; nor did the plaintiff do any thing which was more likely to mislead third persons, than though he had delivered the property to Potter as such common carrier. And it hardly need be said, that a mere bailee can neither give a good title, nor create a valid lien as against the true owner.

The defence must also fail on another ground. This is a special verdict, and we can presume nothing beyond the facts found by the jury. The jury have not found that the defendants purchased the lumber from Potter, or that they made any agreement whatever with him on the subject. It is not even stated that the defendants gave Potter credit on their books for

the lumber.  All that the jury have found on that subject is, that Potter was a debtor to the defendants in a large amount, and the defendants *said* they had given him credit for the lumber on account of such indebtedness.  It is quite clear that the defendants can claim nothing on the ground of being purchasers from Potter.

As to advances on account of the lumber, the verdict states, in effect, that the defendants paid the freight, amounting to $209 ; and on the same day they remitted to Potter, by mail, their acceptance for $250, as an advance on the lumber.  Now as to the acceptance, the defendants seem to have acted as volunteers.  There is nothing to show that Potter either drew a bill on the defendants, or requested them in any way whatever to make him an advance on account of the lumber.  It would have been a fraudulent act on his part to do so, and we cannot presume his guilt.  If the meaning of the fact found be, that the defendants sent Potter an accepted bill of exchange for $250 as an advance on the lumber, there is nothing to show that he either presented the bill for payment, or put the same into circulation.  In his hands the bill would be good for nothing, as he had no right to demand or receive any thing on account of the lumber.  So far as appears, the defendants have never paid, nor are they now liable to pay a single dollar as an advance on this lumber, beyond the sum which they paid for freight.  And as to that, the plaintiff offered to refund the money, and all other charges, when he demanded the lumber ; and the sum which the defendants paid for freight has been allowed to them in the assessment of damages by the jury.

So far as the case is governed by the principles of the common law, it is quite clear that the plaintiff is entitled to recover.  But the defendants insist that they acquired rights under the act of 1830, for the amendment of the law relative to principals and factors.  (*Stat.* 1830, *p.* 203.)  The first section provides, that " every person in whose name any merchandize shall be shipped, shall be deemed the true owner thereof, so far as to entitle the consignee of such merchandize to a lien thereon," in certain specified cases.  Although the words of the section are very

broad, it must, I think, be confined to cases where the goods have been shipped by the owner, or under his authority, in the name of another. It could not have been the intention of the legislature that one who had taken the property as a trespasser or a thief, and shipped it in his own name, should be deemed the true owner, so as to give the consignee a lien for advances. The leading object of the statute was to protect the consignee, when he had, in good faith, paid, or become liable to pay money on the credit of appearances created by the owner of the property. The act was framed upon the statute 6 *Geo.* 4, *c.* 94, which was passed in 1825; and if we may look at that statute to aid in the construction of our own, it will be seen, (§ 1,) that when the goods are not shipped by the owner in the name of another, they must have been "intrusted for the purpose of consignment or of sale" to a person who afterwards shipped them in his own name. Now in this case, the plaintiff neither shipped the goods in the name of Potter, nor did he intrust the goods to Potter for the purpose of consignment or of sale: and if the lumber had been regularly shipped in the name of Potter, I do not see how he could be deemed the true owner, within the meaning of the statute.

But what is quite conclusive, the lumber was not shipped in the name of Potter; but in the name of the plaintiff. The special verdict calls the paper which was signed by Potter's son and delivered to the master of the boat, a bill of lading; but that is a great misnomer. A bill of lading is the written evidence of a contract for the carriage and delivery of goods sent by water, for a certain freight. (1 *H. Black.* 359.) It is signed by the captain or master of the ship or vessel, and states among other things, by whom the goods are shipped, and where, and to whom they are to be delivered. There are generally three or more parts of the instrument; one of which is usually sent to the consignee by the ship which carries the goods; another is sent to him by some other conveyance; and a third is kept by the merchant or shipper. Contracts for the freighting of goods on our canals are usually less full and formal than when the property is to be carried by sea; but they must have all

the essential qualities, or else they cannot have the effect of bills of lading. There was but one bill of lading in this case; and that was signed by the master, and properly delivered to the plaintiff. It stated that the lumber was received for the plaintiff, to be delivered to the defendants in Albany. It conferred no right or authority upon the defendants, beyond that of receiving the lumber, and keeping it subject to the plaintiff's orders.

The defendants seem to have inferred from the paper signed by young Potter, and the draft in favor of the captain for the payment of freight, taken in connection with the former course of business between themselves and Potter, that the lumber belonged to Potter. But that was an error which could give them no rights as against the true owner. The plaintiff had done nothing to mislead them. He had not only provided by the contract that the lumber should be shipped in his own name, but the shipment was actually made in his name; and he was furnished with the proper documental evidence of that fact. If the master had afterwards signed a bill of lading in the name of Potter, it would have conferred no rights upon him, nor upon those who might have been deceived and misled by the false and fraudulent paper. But the master did not sign any bill of lading, except that which was in the name and keeping of the plaintiff.

The case does not fall within the third section of the act. If Potter was the factor or agent of the plaintiff for any purpose, he was not intrusted with the possession of the bill of lading, nor with the possession of any other documentary evidence of title. Nor was he "intrusted with the possession of the merchandize for the purpose of sale, or as a security for any advances." There is no pretence that he made any advances to the plaintiff, which were to be secured by the property. And so far was the plaintiff from intrusting Potter with the possession of the lumber for the purpose of a sale by him, that he provided for a sale by the defendants, and caused the lumber to be shipped to them for that purpose. And besides, it does not appear by the special verdict, that the defen

dants have advanced any money to Potter on account of this lumber; nor that they have incurred any obligation on that account which can be enforced against them. So far as appears, the defendants have lost nothing but the prospect of getting a part of their debt against Potter, out of the property of the plaintiff.

Judgment for the plaintiff.