Tbe case was kept under advisement until tbe 17tb of June, 1856, wben tbe following opinion was delivered, in wbicb, it is understood, all tbe justices of tbe Court of Appeals, wbo beard tbe argument, concurred.
Comstock, J.
—
Tbis is an action for damages founded on a certificate for eighty-five shares of stock in tbe defendants’ corporation, issued to Alexander Kyle, upon tbe security of wbicb tbe plaintiffs loaned to tbat person a sum of money; and tbe first inquiry naturally is, wbat was tbe force and effect of tbe certificate in bis bands ? Tbe mode of presenting tbis inquiry most favorable to tbe plaintiffs, is to consider it as free from tbe difficulty tbat there was no power in tbe corporation, its board of directors, or any of its agents, to create the shares of stock in question. Assuming tbat tbe corporation bad stock at its own disposal, and that Robert Schuyler, as agent, bad full power to sell it in market, and issue tbe proper certificates therefor, it is clear tbat any person dealing with him in good faith, and paying value, would become entitled to all tbe rights and privileges of a stockholder, although tbe agent, by a secret fraud, intended tbe transaction to be for bis own benefit, and used tbe funds wbicb be received for his own private purposes. In such a case, tbe acts of tbe agent being such as tbe corporation was competent to perform, and strictly within tbe powers delegated to him, upon tbe principles entirely familiar, tbe law would not permit third persons to suffer by a secret abuse of tbe trust.
But it is equally clear tbat no rights would be acquired by a party not dealing with tbe agent in good faith, and receiving a certificate of stock without paying any value therefor. To say tbat tbe original bolder of such a certificate could not be admitted to a participation with tbe genuine and bond fide stockholders in tbe property, franchises, and revenues of tbe corporation, is a proposition so plain that it needs only to be stated. Such was *571 tbe situation of Alexander Kyle, tbe original bolder of tbe certificate now in question. To wbat extent be was implicated in tbe frauds of Scbuyler is not material. Tbe certificate is admitted to bave been issued fraudulently, and be paid nothing for it. On tbis ground, it was in bis bands, spurious and void; and tbis is a conclusion wbicb is reached without calling in question tbe power of tbe corporation to create tbe stock, or of Scbuyler as agent, to issue tbe proper evidence thereof to a purchaser in good faith.
Tbe certificate in tbe bands of Kyle was also void, for tbe reasons wbicb will now be mentioned. 1. Scbuyler, as tbe agent of tbe company bad no power to issue a certificate for shares of stock, except upon tbe conditions precedent of a transfer on tbe books by some previous owner, and tbe surrender of that owner’s certificate. He was tbe transfer agent merely, and bis powers were expressly limited to that department of tbe business of tbe corporation. He bad no general certifying power, nor any power at all to certify, except .as incidental, to a transfer of stock by its owner to some one else, and as an incidental power it could only be exércised upon tbe conditions named. 2. Neither tbe board of directors by whom Scbuyler was appointed agent, nor tbe whole body of tbe corporation, had power to create tbe stock wbicb tbe certificate issued to Kyle professed to represent ,• and if tbe stock itself could not be brought into existence by tbe whole power of tbe corporation, tbe certificate issued as tbe evidence of its existence, and tbe right of tbe bolder thereto, was necessarily void. Upon tbe premises last stated, tbe conclusion would be tbe same, even if Kyle bad paid to'the transfer agent tbe full value of tbe stock. He could purchase stock of any person who owned it, but be could not under any conditions obtain it from tbe corporation, or its agents, because there was none to be bad, and none could be created.
Thus far I do not understand that my conclusions differ essentially from tbe views of counsel who bave argued tbe cause for tbe plaintiffs; and if I was not mistaken in regard to tbe general scope of tbis argument, they conceded tbe further result, that tbe plaintiffs, bolding tbe certificate by transfer from Kyle, bave no rights as stockholders, merely for tbe particular reason that tbe . stock cannot exist under tbe charter, tbe essential ground of tbe *572 action in tbe view of tbe counsel, being tbe injury sustained by dealing upon tbe faitb of tbe false representation of stock wbicb tbe certificate contains. Tbe opinions, however, of tbe Judges in tbe court below are before us for examination, as well as those of eminent lawyers who have not appeared upon tbe argument, and I think it is proper to refer to these opinions for tbe purpose of bringing into view all tbe theories upon wbicb it has been supposed tbe plaintiffs’ rights depend.
Mr. Justice Hoffman, in tbe opinion pronounced by him, bolds that tbe certificate was not void, as transcending tbe powers of tbe corporation in tbe creation of stock and issuing certificates therefor, _ or those delegated to Schuyler as tbe transfer agent. He, therefore, considers tbe obligation to be one wbicb tbe defendants can perform, and ought • to perform, according to its terms. He admits that tbe effect of an over-issue is to increase tbe number of shares, but not tbe actual capital; and, according to bis view, tbe spurious certificates are to be made good by a reduction in tbe actual value of those that are now genuine. He bolds, therefore, that tbe defendants were bound to admit tbe plaintiffs as stockholders, and to register their shares on tbe books accordingly; and that this suit depends purely and simply on tbe non-performance of that duty, after being requested to perform it. “Without a demand,” be says, “and refusal to transfer, there would be no ground of action whatever.”
Directly opposed to these views are those of Chief Justice Oakley. He bolds tbe certificate utterly void, because it transcended tbe powers of tbe transfer agent, whose commission, be thinks, was special, and not general; and if tbe action depended on tbe vabdity of tbe certificate, be says, the following questions would have to be answered: 1. Whether tbe plaintiffs, as bond fide holders, could acquire any rights under it superior to those of Kyle, in whose bands it was .void? And, 2. Whether tbe plaintiffs can be considered as bond fide holders ?
As to tbe last point, be indines to think that tbe plaintiffs were bound to see that Schuyler, as agent, did not exceed bis special powers, and, therefore, if they chose to deal in tbe stock without inquiring as to that fact, they took tbe certificate from Kyle' at their peril. But tbe learned Chief Justice, nevertheless, bolds tbe .defendants bable, on tbe ground that tbe certificate was a *573 false representation tbat Kyle beld stock, wben, in truth, be did not. He thinks that Schuyler, the agent, had an implied authority from the company to make such a representation — an authority resulting frota his constant habit of issuing certificates in the same form, in the course of the regular business of the corporation. If, as he assumes, the certificate was void, tested simply by the authority given to the agent, and if, as he also assumes, the plaintiffs were bound to take notice of the want of authority, with deference, it appears to me, that they are affected by the same considerations when they change the grounds of complaint to misrepresentation and fraud. Can an agent’s authority to misrepresent in the course of a dealing, be inferred, when it is admitted he has no authority to enter into the dealings at all?
Justices Bosworth and Slosson, if I do not misunderstand them, both admit that there was no power in the corporation to create the shares which the certificate professes to represent, and that the instrument, considered as a real representative of the stock, was void for that reason; thus discarding the only ground upon which, in the opinion of one of their brethren, the action can be maintained. They, nevertheless, held that fhe suit is not founded upon the notion of misrepresentation and fraud, thus as distinctly rejecting the theory of the other. They appear to me to have found a middle ground of liability, which is, perhaps, fairly expressed in the following language of Justice Bosworth; “The certificate,” he says, “ so far as any inferences can be drawn from its terms or appearances, purports to be, and is, as much the act of the defendants as any certificate that has been issued by the company representing genuine stock. The plaintiff took it believing it to be what it purports to be, and their action is based on the theory, that, as between them and the defendants, it is, in judgment of law, the act of the defendants; and that the defendants are estopped from asserting the contrary, so far as the question of their liability for refusing to reimburse to the plaintiff the amount of their loan to the extent of the value of the stock is concerned.” And again, he says: “ The action is based on the assumption, so far as the right to be compensated in damages, is concerned, that the company has given an assurance that Kyle owned the stock which the certificate represents stood to his credit on its books.” The reasoning by which these results are reached *574 is, in substance, tbat tbe act of Schuyler in issuing tbe certificate was witbin tbe apparent scope of bis powers, and, therefore, although tbe contract was void, because it transcended all tbe powers of tbe corporation, and it was impossible to be performed, for tbe same reason, tbe defendant must, nevertheless, make it good in damages, upon an assurance tbat it was valid, tbe assurance being a part of tbe contract itself. I confess my own impression to be tbat this reasoning is too refined. Admitting tbat tbe agent acted witbin tbe scope of tbe power delegated to him by tbe board of directors, I do not clearly see bow certificates .of stock which they, themselves, bad no authority to issue, void in their origin and under all circumstances, can be made tbe basis of a liability ruinous to tbe genuine stockholders, by turning tbe spurious instruments into a promise or understanding tbat tbe stock, in fact, existed.
Tbe extreme difficulty which has been encountered in endeavoring to find a principle on which to rest tbe action, may be further illustrated by reference to tbe professional opinions which have been submitted to our examination. In one of them — certainly' entitled to tbe very highest respect, tbe reasoning of which, I think, must have been, in substance, approved by Mr. Justice Hoffman — it is claimed, tbat all tbe over-issued certificates are valid, so far as the question of corporate power is concerned; tbat tbe multiphcation of shares did not increase tbe capital stock, but merely reduced tbe value of tbe shares; tbat tbe acts of Scbuyler, in issuing such certificates, were done witbin tbe scope'of bis authority as agent; and, as a conclusion from these premises, tbat all tbe holders in good faith, who bad not already received new certificates in their own names, were entitled to receive them, and so to be admitted to all tbe rights and privileges of stockholders. In another of these opinions, distinguished by .great acuteness and force of reasoning, tbe clear and emphatic concession is made, tbat tbe defendants have no corporate right to create a valid title to a single share of stock beyond tbe prescribed number ; that tbe corporation, being prohibited from issuing more than thirty thousand shares, was, by necessary .consequence, forbidden to recognize, as a part of its stock, any .share known to have been issued contrary to tbat prohibition, and consequently, tbat tbe directors might refuse to recognize all shares *575 wbicb could be clearly traced to an origin in tbe over-issue. In respect to all sucb shares, it is claimed, however, that compensation in damages must be made by tbe corporation to tbe innocent holders, who, by dealing in them, have suffered pecuniary loss. Tbe issue of false certificates, it is insisted, was a failure of corporate duty, an act of negligence, by tbe corporation, for wbicb it is bable to tbe party injured. Tbe company, it is also said, is bound by an estoppel in favor of tbe innocent shareholder, and must either recognize him as a stockholder, or respond in damages, as a wrong doer, for withholding bis apparent right.
If those who assert that this action can be maintained, bad been able to agree upon a reason for that opinion, there would be fewer propositions to discuss than I shall feel obbged to examine.
I have already stated, in general terms, my own conclusion to be on tbe side of tbe invalidity of tbe so-called spurious shares, upon tbe ground of a want of corporate power to create them, and I will now give some further expression to my views on that question. By' tbe charter of this railroad company its capital stock was limited to $8,000,000, to be divided into shares of $100 each. It is admitted that tbe whole capital was subscribed and paid in, and that certificates of stock were issued representing tbe 30,000 shares actually subscribed and paid for. Now, if it is plain, as all concede, that tbe capital could not be increased beyond $3,000,000, it seems to me equally plain that no more than 30,000 shares could be created. Both are unalterably fixed by tbe charter; tbe capital, by expressing tbe aggregate amount, and tbe number of shares, by expressing tbe amount of each. Tbe whole capital is divided into shares of $100 each, and tbe mathematical result is 30,000 in all. Viewing tbe question, therefore, as one of abstract power, nothing appears to be wanting to a complete demonstration that additional shares could not be created. There is, under tbe charter, no more capacity to increase tbe nominal capital by multiplying tbe shares to an indefinite extent, than to increase tbe real capital by an actual subscription, indefinitely beyond tbe specified limit.
But it is important to observe, that tbe question has other relations than those wbicb belong to it as one of simple capacity and power. Tbe 30,000 shares of original stock subscribed and *576 paid for by tbe persons to wbom .the genuine certificates were issued, belonged to them in their individual right, and were as much their separate and individual property, as any other possession which they could acquire. The entire capital was'represented in the property and franchises of the corporation, and the owner of each share was entitled to a fixed and unalterable proportion of that capital. And from this it follows, that any attempt to create a greater number of shares by the issue of additional certificates, is not only a violation of the organic law of the corporation, but a direct invasion of the contract between it and each holder of its original stock. Now, while it cannot be denied that the value of every share may be reduced by misfortune or accident in the management of the business of the corporation, or by the neglect and misconduct of its agents, acting within their acknowledged powers, it is equally plain, that this result cannot be affected by a change in the fixed proportion which each share bears to the aggregate number. It has been said, that the limitation of the capital and the number of shares was imposed from considerations of public policy alone. This is not so. Those who asked for the charter, and proposed to invest their private capital in the enterprise which it contemplated, required such a limitation for their own protection; and every individual who subscribed and paid for shares of stock, must be deemed to have done so relying upon the charter for the safety of bis investment.
The conclusion to which I am brought upon the question, is not impeached by the consideration, (if such is the fact,) that there are shares and certificates of stock beyond the original limit, which cannot be traced to an over-issue by the fraudulent agent of the company. I know not how the facts may be in this respect, nor is it material to the argument. The corporation may be compelled to respond to the holders of certificates, amounting in the aggregate to more than its capital, because it cannot distinguish those which are spurious and those which are genuine. Thus the number of shares to be recognized may be practically increased, not for the reason that all over-issues are not void, but because, in a given instance, the corporation cannot show that the shares claimed are of that character. No question of this kind arises in the ease before us.
I have also stated in general terms, as one of my conclusions, *577 tbat tbe certificate issued to Kyle, was void in bis bands, upon tbe more special ground tbat tbe agent could not certify, except upon conditions wbicb did not exist in respect to tbat transaction. I observe now, further, tbat a third person, dealing with Kyle, and taking from him a transfer of tbe certificate, doubtless bad reason to suppose tbat it bad been duly issued. Whether a dealing with him under tbat belief created new rights against tbe corporation I shall presently examine. But Kyle himself dealt directly with tbe agent of tbe company, and be knew tbe conditions bad not arisen in wbicb tbe power to certify depended. He knew this, because be surrendered no previous certificate, and bad no transfer on tbe books or otherwise from any actual shareholder. Now, I do not understand it to be claimed, on tbe part of tbe plaintiffs, tbat tbe acts of tbe agent in issuing tbe spurious certificates were within any actual power wbicb tbe corporation ever attempted to confer upon him, nor tbat all persons proposing to deal in tbe stock were not chargeable with a knowledge of tbe extent and limit of bis authority. He was known to be a transfer agent merely of existing and genuine shares, and in tbat character bis name was signed to tbe certificate in question, and all others. What is claimed I understand to be precisely this: Tbat tbe false certificates being regular on their face, and tbe same in form as those which were genuine, presented to third parties dealing in them all tbe appearances of having been duly issued, although in fact tbe agent bad no authority to issue them, and although tbe exact extent of bis authority was known. But these appearances were known to be false by those who dealt directly with tbe agent; and with tbat knowledge it is not pretended tbat they can assert any claim against tbe corporation. Such was tbe situation of Kyle.
It is as well in this connection as any other, to notice a special feature of tbe transaction, wbicb I think imparts neither strength nor weakness to tbe plaintiffs’ case. Tbe facts, as they appear in tbe finding of tbe Judge, axe, tbat Kyle received tbe certificate not for bis own but tbe agent’s use, and having negotiated with tbe plaintiffs a loan by pledging it as security, paid tbe proceeds of the transaction over to tbe agent. But these facts were not known to tbe plaintiffs. They dealt with Kyle as tbe owner. Upon tbat theory they have a right now to rely, and I understand *578 them to do so. It is tbe best tbe case will admit of. If tbey cbose to take tbe facts as tbey actually are, and to regard Kyle as a negotiator merely between them and tbe fraudulent agent of tbe corporation, tbey would tben stand in tbe position of an immediate dealer witb tbe agent, receiving from bim a certificate of stock issued without authority • and tbis position, as I bave shown, would be fatal to their claim.' Tbey justly prefer to be regarded, and I do regard them, as third parties, dealing witb Kyle as tbe apparent owner of stock.
In order to keep in view tbe exact conditions of tbe general question, I think it proper to state tbe conclusions which I consider thus far established. Tbey are as follows: 1. Tbe certificate was void in tbe bands of Kyle, tbe first bolder, because it was fraudulently issued, and be paid nothing for it. 2. It was also void in bis bands, because issued by an agent without authority, there being no surrender of a previous certificate, and no transfer to bim, on tbe books, of actual stock, and tbis want of authority was known to him, S. It was void, because tbe stock it professed to represent bad no existence, and could not exist under tbe charter of tbe company, all tbe powers of tbe corporation in tbe creation and issue of stock being exhausted. In respect to tbe conclusion last mentioned, it must be, and I think is conceded, that as a further result tbe certificate is void under all possible circumstances, so that no person, in whatever situation, can claim under it tbe rights of a stockholder, or damages, on tbe ground of a refusal to admit bim .to such rights. As tbe law will not require tbe defendants to violate their charter by creating an excess of stock to supply tbis spurious certificate, so it will not punish them in damages, .for refusing simply to be guilty of such violation. I .consider this result so necessary and so evident as not to require further discussion.
I will proceed, however, to a more particular examination of tbe plaintiffs’ rights as tbe transferees of Kyle, and, giving them tbe most favorable view of tbe case, will consider tbe certificate as void in bis bands only on tbe grounds that it was issued fraudulently, without 'consideration, and without any authority contained in tbe terms of Schuyler’s appointment as transfer agent. ,In tbis view, tbe defendants’ corporation is regarded as competent to recognize tbe certificate, and if tbey are bound to do so, tbey *579 must respond in damages upon tbeir refusal. The question, therefore, will be, Are they so bound ? or, to state it in another form, Are the plaintiffs in a situation to assert any rights against the company which Kyle, their assignor, did not possess?
By the charter of this corporation, the shares of its capital stock were made transferable in such manner and in such places as the by-laws should direct, and the by-laws declared that all transfers should be made in the transfer-book, kept at the proper office, and where a certificate of the stock had been issued, that the same should be surrendered prior to the transfer being made. The certificate now in question, as all others, declared on its face the same conditions. This certificate has in fact never been surrendered, and. no such transfer ever has been made. The plaintiffs, on making their loan to Kyle, took from him an assignment and power of attorney in blank, but paid no regard to the fundamental conditions on which alone a legal title to the stock could be transferred. Of these conditions of course they had notice. ■
I am aware it is common to deal in this manner in the stock of corporate companies, and I do not say that any rule of law or of public policy is violated by it. The dealer undoubtedly acquires an equitable title to the stock of his vendor, and if the vendor’s title is open to no impeachment, he has a right to call upon the corporation to clothe him also with the legal title, by permitting a transfer to himself on its books, and to demand a new certificate in his own name. But the question here is, not whether the purchaser is clothed in equity with all the rights of the seller, but whether by a transfer not made according to the laws of the corporation, he acquires new and superior rights as against the corporation itself; in short, whether his title is good when that of his vendor was good for nothing.
So, too, it is common to deal in this manner with respect to obligations of every description. If extreme caution is exercised, the purchaser will inquire of the maker of the obligation, and procure his admission of its validity and his assent to the transfer ; and having done so an estoppel will arise in his favor, not because he has invested his money in the purchase, but because he purchased after procuring such admission or consent, and upon the faith thereof. Where there is no estoppel of this sort to rely upon, then the question whether the transferee of an obligation, *580 apparently sound, and from tbe apparent owner, acquires any better right to enforce it than bis assignor bad, depends on tbe nature of tbe obligation itself. Tbe general and familiar rule is, tbat be does not. If tbe instrument bas negotiable qualities, then be may. In tbe case of negotiable instruments tbe legal title passes by mere endorsement or delivery. When tbey are not negotiable, an equitable title is all tbat can be acquired; and tbis suggests tbe further observation tbat, as between equities merely, tbe prior one, as a general rule, prevails. Tbe prior equity, as well as tbe law, is in favor of tbe party who made tbe obligation, if for any good and valid reason be ought not to be bound by it. Tbe principle is so familiar tbat authorities need not be cited.
It seems to me, therefore, tbat we are'brought directly to tbe question, whether certificates of stock in tbe defendants’ corporation are to be regarded as negotiable instruments, in tbe sense of tbe commercial law, so tbat by their endorsement and delivery to a purchaser in good faith, a title to tbe stock tbey profess to represent may be acquired, although in tbe band of tbe vendor they are spurious and void, and although the company itself bas never recognized tbe transfer. Tbis question, I think, must be answered in tbe negative. Tbey contain, in tbe first place, no words of negotiability. Tbey declare simply tbat tbe person named is entitled to certain shares of stock. Tbey do not, like negotiable instruments, run to tbe bearer, or to tbe order of tbe party to whom tbey are given. They commence, it is true, with tbe words, “ be it known,” but such words have no tendency to show tbat tbey possess tbe quality claimed for them. A phraseology quite similar may be found in bonds and other instruments, which no one ever thought to be negotiable.
But aside from tbe absence of any language of these certificates, which can impart to them a negotiable character, both tbe laws of tbe corporation and tbe certificates themselves contain special restrictions, which seem to me to put tbis question at rest. I do not suppose tbat a corporation, without something very extraordinary in its charter, can place such restraints upon tbe sale of its stock, tbat tbe individual bolder may not transfer as good a title in equity as be himself possesses, by any mode of assurance good upon general principles of law. But if a natural person bas *581 an undoubted right so to express the terms of his obligation that it shall not be negotiable in the commercial sense, or in any sense which can give to the purchaser a title superior to that of his vendor, I see no reason to doubt that corporations possess the same right. Have the defendants so expressed themselves in these certificates of stock ? I think they have. They have distinctly declared, both in their by-laws and on the face of the certificates, that shares can be transferred only on the books, and on the surrender of the evidence of the previous owner’s title. If an illustration were wanting of the value of such a restriction, it is furnished in the present case. But whatever its value, the restraint is lawful in itself, and one which the corporation had an undoubted right to impose. I do not say that it prevents the owner of stock from selling his shares by an outside transfer, so that his vendee will acquire in equity his own rights; but to say that the holder of a false and fraudulent certificate, by endorsing and delivering it to another person, can create a title hostile to the corporation itself, would be to deny to the restriction any meaning or effect whatever.
I have examined attentively the authorities cited upon the question, but do not find that the doctrine contended for has in them the least support. In the case of Kortright v. The Commercial Bank of Buffalo, (20 Wend. 91, S. C. in error, 22 Wend. 348,) it was held, that an action of assumpsit will he against the corporation in favor of the assignee of a stock certificate, for refusing to permit a transfer on the books. This and the class of'cases to which it belongs, prove that a transfer not made according to the charter or by-laws of a corporation, confers upon the transferee, in an equitable sense, the title of the previous owner; that, being thus clothed with the equitable title, it is the duty of the corporation to permit him to take a legal transfer on the books-;- and that the law will imply an assumpsit for the performance of'that duty; For a breach of this duty, actions of assumpsit and'case have been-indifferently maintained. In principle, the remedy-should' have been a special action on the case. Such was the opinion of Chief Justice Nelson in the case referred to; but he-adds,-. “It'being once settled, (that assumpsit will lie,) there is no occasion for disturbing it.” It is only material to observe, that the assumpsit ⅛⅝ not in the certificate itself, and so passing by endorsement and’ *582 delivery to tbe transferee, but is implied after tbe transfer, from tbe duty of tbe corporation to clotbe tbe equitable owner witb tbe legal title. Sucb cases, so far from tending to show that a dealer in certificates acquires rights better tban those of tbe person witb whom be deals, seem to me to justify quite an opposite conclusion. They necessarily assume that the change of title is incomplete, until tbe proper transfer is made on tbe books.
In tbe case of Fatman v. Lobach, (1 Duer, 354,) no question arose involving tbe rights of tbe corporation. The decision is directly opposed to that of Chancellor Walworth in Stebbins v. Phœnix Bank, (3 Paige, 350,) and my own impression is, that it cannot be sustained. I find in it, however, nothing which can affect tbe question I am considering. Tbe case was disposed of upon principles which were not asserted as having any peculiar application to dealing in stocks or negotiable securities. Tbe case of Stoney v. The American Life Insurance and Trust Company, (11 Paige, 635,) only held that tbe negotiable security of a corporation, appearing on its face to have been duly issued, was valid in tbe bands of a bond fide bolder, although, in fact, issued contrary to law. The case of Delafield v. The State of Illinois, (2d Hill, 159,) related to state bonds, payable to bearer, and strictly negotiable. Sucb securities are sometimes called stocks, but a confusion of terms should not involve principles in obscurity.
In tbe case of Fisher v. The Morris Canal and Banking Company, (3 Am. Law Reg. 423,) tbe question-was whether tbe bonds of a railroad corporation, payable to bearer, issued for tbe purpose .of raising money, witb interest coupons attached, also payable 'to bearer, were negotiable in sucb sense that a purchaser for value- took them free from any equities between tbe company and . tbe seller. Tbe decision was in favor of tbe purchaser, and I fully concur in tbe doctrine. Tbe distinction between sucb a security and a stock certificate, which by its very terms is not negotiable, and which is not a security for money at all, it seems to me is too plain to escape observation.
These are tbe only authorities cited in favor of tbe doctrine contended for. It is quite evident that they have no tendency in that direction. I will now mention some which are decisively ¡the other way. In tbe case of tbe Union Bk. of Georgetown v. Laird, (2 Wheaton, 390,) tbe stock was transferable, only on tbe *583 books of tbe corporation. Tbe precise propositions decided, were, tbat no legal title to shares could be acquired except by a transfer made according to tbe requirement, and tbat tbe equitable title of tbe transferee was subject to all tbe rights of tbe corporation against bis assignor. Tbe same doctrine was held by Chancellor Walworth in Stebbins v. Phœnix Fire Ins. Co. (3 Paige 350.)
In tbe state of Connecticut there bare been a series of cases going still further. Tbe registry on tbe books, when required by tbe charter or by-laws of a corporation, is deemed tbe originating act in tbe change of title to stock, and a transfer not so made, is regarded as ineffectual for any purpose. (2 Conn. 528; S ib. 544; 5 ib. 246; 6 ib. 552.) So rigorous a doctrine has not been followed elsewhere, and, I think, tbe established rule now is, tbat a transfer of stock not made in tbe manner prescribed, is, nevertheless, vahd so as to pass in equity all tbe rights of tbe seller, but no greater. See further, (Angelí and Ames on Corporations, 352, 352, 3d ed.) where tbe rule is stated and tbe cases cited.
Looking at tbe question upon principle, I am not aware of any thing in tbe nature or uses of this kind of property, which requires an application of tbe rules which belong to negotiable securities. Stocks are not like bank bills, tbe immediate representative of money, and intended for circulation. Tbe distinction between a bank bill and a share of bank stock, it is not difficult to appreciate. Nor are they, like notes and bills of exchange, less adapted to circulation, but invented to supply tbe exigencies of commerce, and governed by tbe peculiar code of tbe commercial law. They are not like exchequer bills, and government securities, which are made negotiable either for circulation or to find a market. Nor are they like corporation bonds, which are issued in negotiable form for sale, and as a means of raising money for corporate uses. Tbe distinction between all these and corporate stocks is marked and striking. They are all, in some form, tbe representative of money, and may be satisfied by payment in money at a time specified. Certificates of stock are not securities for money, in any sense, much less are they negotiable securities. They are simply tbe muniments and evidence of tbe holder’s title to a given share in tbe property and franchise of tbe corporation of which be is a *584 member. The primary use and design, I must be allowed to say, of this species of property, is to afford a steady investment for capital, rather than to feed the spirit of speculation. I am aware that people will speculate in stocks as they sometimes do in lands, and there is no law which absolutely forbids it; but such, I am persuaded, is not the use for which we should hold them chiefly intended.
The question is capable of some further elucidation, by attending to the rules'which have been settled in regard to the transferability of other instruments, and the effect of transfer. A certificate of stock is in some respects like a bill of lading, or a wárehouse or wharfinger’s receipt. Each is the representation of property existing under certain conditions, and the documentary evidence of title thereto. They are all alike transferable by endorsement and delivery, and the title to the property thus represented passes by such transfer. So far they resemble each other, but there are distinctions to be noted. Bills of lading and wharfingers’ receipts are commercial instruments, and their transferability, or, as it is sometimes termed, their “ quasi negotiability,” depends on the custom of merchants, and the conveniences of trade. Certificates of stock are not commercial instruments, and the title to the property they represent, passes in equity, only by endorsement and delivery, where, by any law or rule of the corporation, the transfer is required to be made on the books.. With these resemblances and these distinctions, if a bill of lading is not negotiable in the sense which must be contended for in the present case, there is much greater difficulty in affirming that such a quality belongs to a stock certificate.
In the great case of Lickbarrow v. Mason, (2 Term Rep. 63; 5 ib. 367,) it was held that the consignor of goods had lost his right of stoppage in transitu, when the consignee, holding the bill of lading, endorsed in blank by the consignor, delivered it to a third person, who received it in good faith, and made advances upon it. This has been the settled rule ever since; but, in such cases, it is to be observed, the legal title to the goods has vested, by the sale and consignment, in the consignee, subject only to the peculiar and anomalous right of arresting their delivery in the event of insolvency. If, therefore, before this right is exercised, the consignee transfers the bill of lading to another person, who *585 takes it in good faith and for value, the latter acquires the title which his vendor had at the time of the transfer, and which the consignor cannot afterwards take from him by stopping the goods before they have reached their destination. In this doctrine, which was settled after a very remarkable contest in the courts of England, is contained all the negotiable quality that belongs to a bill of lading, and it requires but little discrimination to see that this is not negotiability in any just sense of that term. On the other hand, it has been held by the Supreme Court and the late Court of Errors of this state, (Saltus v. Everett, 15 Wend. 475 ; 20 ib. 257,) that a bill of lading covering goods shipped, but made without the owner’s authority, cannot affect the owner’s title, into whatsoever hands the instrument may come. So it has been lately held in the English Queen’s Bench, (Gurney v. Behrend, 3 Ellis & Black. 622,) that if a bill of lading is misappropriated, as if it be endorsed in blank by the consignor and sent to his correspondent, but not intending thereby to have it transferred, and the person receiving the bill transfers it for value, the title to the goods is not affected by the transaction. Lord Campbell, in delivering the judgment in that case, very explicitly denied the negotiability of such instruments. In Corill v. Hill, (4 Denio, 323,) Chief Justice Bronson had occasion to say: “ If the master of a vessel, after signing a bill of lading to the owner of the goods, should give one to another person, it would confer no rights upon those who were misled by the false and fraudulent paper.” (See also Thompson v. Dominey, 14 Mees & W. 402; Zachrison v. Ahman, 2 Sand. 68; Com. Bk. of Roch. v. Cole, 15 Barb. 506.)
It is conceded that Kyle, the first holder of the certificate in question, could assert no title to the stock it appears to represent, and that in his hands it was spurious and void for all the reasons which have been mentioned. Before its transfer to the plaintiffs can be admitted to confer any better title upon them, it must be shown to have not only all the negotiable qualities of a bill of lading, but others, also, which that instrument does not possess.
• Testing this question, therefore, in any conceivable mode, whether by the express terms of these certificates, by their general nature and character, by the authority of adjudged cases, or *586 by the most favorable analogies, I bave no hesitation in saying, that the doctrine contended for. is entirely without foundation. It is mainly by assuming for these instruments the possession, in a greater or less degree, of the peculiar qualities of negotiable securities, that the plaintiffs claim to have acquired, by transfer, better rights than their assignor had; and as that assumption fails, this claim falls to the ground.
It.was also said on the argument, that these certificates of stock are in the nature of renewal letters of credit, oh the faith of which any one might act; and upon this idea it was insisted that the defendants are, in some way, bound by the obligation in the hands of the plaintiff. I am unable to see the analogy suggested. By attending to the mere definition of a letter of credit it will be seen there is no resemblance. Thus, in McCulloch’s Commercial Dictionary, it is defined to be “ a letter written by one merchant or correspondent, to another, requesting him to credit the bearer with a sum of money.” Or, to take the further definition of another author, it is “ an open or sealed letter from one merchant in one place, directed to another in another place, requiring him, if the person therein named, or the bearer of the letter, shall have occasion to buy commodities or want moneys, that he will procure the same or pass his promise, bill, or other engagement for it, on the writer of the letter undertaking that he will provide him the money for- the goods, or repay him by exchange, or give him such satisfaction as he shall require.” (3 Chitty, Com. Law, 336; Bouvier’s Law Dictionary.)
Now, while it may be the effect of a stock certificate to give the holder a credit, its terms do not request, invite, or guarantee it. So the possession of property of any description, or of the evidence and muniments of title thereto, in their effect, give to the possessor a credit with other men. In this sense, every chose in action invites a credit in favor of him who holds it, and so do the title-deeds of his real estate. Innocent parties may deal with him and be deceived. They may lend their money and lose it. Nothing more than this can be said of a certificate of the ownership of stock in a corporation. Regarded as a promissory instrument, imposing obligations to be performed by the artificial person which makes it, it is like any other chose in action, except as greater restrictions may be placed upon its transfer and sale. Regarded as *587 a muniment of title, merely, it is like any other instrument by which title is manifested. But to say that, like a letter of credit, it contains a request express or implied, addressed to aüy one in' particular, or to the community in general, to deal with or advance money to the holder, or that it contains any assurance or guarantee addressed to the dealer, of the safety of the transaction, is, in my judgment, to confound plain and long settled distinctions.
I will now briefly examine the validity of the plaintiffs’ title in another aspect, still keeping out of view, however, the absolute want of power in the corporation to create the stock in question. It has been mentioned as one of the reasons why the certificate was void in the hands of Kyle, that Schuyler, the agent, was not acting within the scope., of his powers when he issued it. The full effect of this particular objection upon the plaintiffs’ rights as the transferees of Kyle, has not been considered. And I observe now, in the first place, that if, upon a vague theory of negotiability, (already examined,) they could overcome the difficulties arising out of the fraud of the agent toward the company as his principal, and out of the want of consideration, this objection would still have to be removed. It is obvious, upon a moment’s reflection, that negotiability can impart no vitality to an instrument executed under a power where the agent has exceeded his actual or presumptive authority. Whoever proposes to deal with a security of any kind, appearing on its face to be given by one man for another, is bound to inquire whether it has been given by due authority, and if he omits that inquiry he deals at his peril.
It is not denied that the plaintiffs, in taking the certificate in question, were chargeable with notice of the extent and limit of the powers of Schuyler as transfer agent. All that is claimed in their behalf is, that his act in issuing it was apparently and presumptively, although not actually, within his authority. Upon this ground it is urged that, according to the rules which govern the relation of principal and agent, the defendants are bound in some way to make the obligation good. The extent of the authority, it is admitted, the plaintiffs knew, or were bound to know; but it was not known, they say, that the act done was not within súch authority.
There are in the books many loose expressions concerning the *588 distinction between a general and special agency. The distinction itself is highly unsatisfactory, and will be found quite insufficient to solve the great variety of cases. It is not profitable to dwell upon that distinction. Underlying the whole subject there is this fundamental proposition, that a principal is bound only by the authorized acts of his agent. This authority may be proved by the instrument which creates it; and beyond the terms of the instrument, or of the verbal commission, it may be shown that the principal has held the agent out to the world, in other instances, as having an authority, which will embrace the particular act in question. I know of no other mode in which a controverted power can be established. But in whichever way this is done it cannot be limited by secret instructions of the principal on the one hand, nor can it be enlarged by the unauthorized representation of the agent on the other. These principles, I think, are elementary.
But suppose an agent is authorized by the terms of his appointment to enter into an engagement, or series of engagements, on behalf of his principal, and while the appointment is in force he fraudulently makes one in his own, or a stranger’s business, but in the form contemplated by the power, and which he asserts to be in the business of his employer, by using his name in the contract, can the dealer rely upon that assertion and hold the princi.pal, or is he bound to inquire and to ascertain, at his peril, whether the transaction is not only, in appearance, but in fact, within the authority ? According to the authority of the Supreme Court of this state, in the case of The North River Bank v. Aymer, (3 Hill, 362,) he can. There the agent was authorized to draw and endorse notes in the name and for the benéfit of his principal. He drew various notes, which in their appearance were within the power, but really had no connection with the business of his principal. The plaintiff bank, which had the letter of attorney in its custody, discounted them, and it was held they could be recovered against the principal. Justice Cowen and Chief Justice Kelson delivered opposing opinions, in which the question is very elaborately discussed. The decision was reversed in the Court of Errors, but the case is not reported in that court. If the reversal proceeded, as I suppose it must have done, upon a doctrine directly opposite to that held by the Supreme Court, then the case certainly suggests *589 a limit of great importance to tlie liability of principals, tbe recognition of which would be decisive of tbe present controversy. So in Grant v. Norway, (10 Com. Bench,) it was beld, after full discussion, that tbe master of a ship signing a bill of lading for goods, not actually shipped, was not to be considered tbe agent of tbe owner of tbe vessel, so as to make him responsible to one who made advances upon faith of tbe bill. That is a strong case. Tbe master is tbe general agent of the owners, as to all matters within tbe scope of bis duty and employment, and has unquestionable power to sign bills of lading for goods shipped; and every bill asserts, as it did in that case, that the goods are received on board. Tbe act, therefore, judged by its appearance and tbe representation of tbe agent, was strictly within tbe power. But tbe principal was beld not to be liable, because it was not so in fact. Tbe doctrine of that case was affirmed by tbe English Court of Exchequer in Hubertsey v. Ward, (3 Exchequer Rep. 330, S. C. 18 Eng. Law and Eq. Rep. 551,) and again with great debberation by tbe Common Pleas in Coleman v. Riches, (29 Eng. Law and Eq. Rep. 323.)
Tbe distinction is not always attended to between tbe apparent powers of an agent, and bis acts apparently, but not really, within, tbe power. An agent’s apparent powers are those wbicb are confirmed by tbe terms of bis appointment, notwithstanding secret instructions, or those with wbicb be is clothed by tbe character in wbicb be is beld out to tbe world, although not strictly within bis commission. Whatever is done under an authority thus manifested is actually within tbe authority, and tbe principal is bound for that reason. But it is obvious that an agent may clothe bis act with all tbe indicia of authority, and yet tbe act itself may not be within tbe real or apparent power. Tbe appearance of tbe power is one thing, and for that tbe principal is responsible. Tbe appearance of tbe act is another, and for that, if responsible, I think tbe remedy is against tbe agent only. Tbe fundamental proposition, I repeat, that one man can be bound only by tbe authorized acts of another. He cannot be charged because another bolds a commission from bbn, and falsely asserts that bis acts are within it.
Gases may often arise wbicb to a casual observation might appear to be within tbe principles stated, but wbicb really are not. *590 Thus, an agent may be authorized to give notes for his principal in order to raise money to he used in the business of the latter. A third person may inspect the power, advance the money in good faith, and the agent appropriate it to his own use. In such a case, I should hold the principal responsible, not because the act of the agent appeared to be within the authority, but because the authority actually included the transaction. A power given to an agent to borrow money upon notes or otherwise, implies that the money may be paid to him, and so the whole transaction is strictly and literally authorized. But suppose the power to give the note is on its face conditional. It then has no existence until the condition has been fulfilled. To a confiding dealer, who believes that the agent would not do an improper act, the note will certainly carry the appearance of due authority, but if it turns out that the conditions had not occurred on which the exercise of the power depended, then he was trusting to the representation of the agent, and, I think, must look to him alone. As the principal never authorized the transaction at all, he is bound neither by the contract, nor by the representation. If not by the former, then it is extremely plain he is not by the latter.
Connected with the observations last made, it is proper, though perhaps scarcely necessary, to notice another doctrine which has been much urged, under some disguise, it is true, but in effect that the very employment of an agent in situations of trust and confidence is a recommendation and certificate of his character, so that if he deceives’ others to their injury, the principal must make compensation. If by this it were only meant that where the agent is guilty of fraud or deceit, in doing his employer’s business, the latter is responsible, the doctrine is entirely true. (Story’s Agency, § 482, and cases cited.) But'm all its other aspects and forms of statement, the doctrine is unsound. If the agent, in dealing for his principal, and within the power, commits a fraud, the principal is liable: not upon the ground that he holds the agent out to the world as an honest man, but because the fraud enters into and is a part of the authorized transaction. If the agent deals dishonestly for his principal, it is in a just sense a wrong done by the principal himself although unknown and unauthorized. But the dealing itself must be authorized. If the transaction is not within the power, then as the dealing is imputed *591 to the agent personally, so, necessarily, are all the circumstances attending it, and all the means and instrumentalities by which the fraud is consummated. The power of the agent to charge his principal by doing a wrong, must be traced directly to his authority, and it cannot be referred to an increased facility for imposing on the credulity of others, derived incidentally from his appointment to a situation of trust. If the fraud consists in an over representation of his power to act, by which others are drawn into dealing with him, then it is a self-evident proposition, that a man can no more enlarge than he can create a power, by such a representation.
Applying the principles which have been stated in this branch of the discussion, they are decisive against the plaintiffs. If the corporation had held stock, and Schuyler had been the agent to sell it, and issued certificates therefor, a sale and a certificate issued by him would have been valid against his principals, although by a private fraud he appropriated the proceeds to his own use. The transaction with the purchaser, in all its branches, the sale, the certificate, and the payments to him of the money, would have been not only apparently, but actually, within the powers. His misappropriation of the proceeds would have been a mere breach of trust relating to money in his hands, and upon the principles of trust, his intention to misappropriate would not affect an innocent party.
But such were not the relations between Schuyler and the corporation, nor was he held out to the world as standing in such relations. He had no power to sell stock at all, and none to issue certificates, except as incidental to a sale between existing stockholders ; and then it depended on the conditions precedent to a transfer on the books, and a surrender of a previous certificate for the same stock. The authority which he assumed to exercise, therefore, confessedly, never had an actual existence, and within the principles which have been stated, it never had an apparent existence. His appointment, in its very terms, which all dealers are supposed to have been acquainted with, did not include his acts, and there is no pretence that the authority it conferred was ever enlarged by any holding out or recognition of such acts. All that can be said in behalf of the plaintiffs is, that the certificate itself implied a representation or assurance that it was issued *592 within the power; in other words, that the conditions on which the power depended had been fulfilled. Even this representation when closely scanned, was no more than an inference of the dealer that, as the agent had no authority to certify, except under conditions, those had been in fact performed. But the conclusive' answer is, that the defendants never authorized any such representations. To say that they had, would be simply saying that they authorized the certificate, because the representation was contained in that and existed nowhere else, and this would be assuming the very point in dispute. The representation or assurance, therefore, if such we call it, was the unauthorized act of the agent. Upon this the plaintiffs naturally,, no doubt relied, and so doubtless the dealer did, upon the bill of lading, in Norway v. Grant, (supra,) which contained an express declaration that the goods wei’e shipped. The precise difficulty is, that they relied upon the appearance which the agent gave to the act, and by that they were deceived. They were under no deception as to the power in its real or apparent scope. Testing the question by any rule of agency with which I am acquainted, the defendants were not bound by the transaction.
If any one of the main conclusions at which I have arrived in this discussion is sound, there is no remaining ground on which the action can be sustained. Viewing the certificate in question as unaffected by the want of power in the corporation to create or recognize the stock it appears to represent, we have seen, that it was void in its origin, because issued without consideration, and in fraud of the defendants’ rights. "We have also seen, that those objections were equally fatal to its validity in the hands of the plaintiffs, as the assignees of the first holder. It has been further shown that the instrument imposed no obligation or duty on the defendants, upon the more special ground that the act of Schuyler, in issuing it, was not within any authority which they ever, in fact or in pretence, conferred upon him as their agent; and, if this objection is sound, the further observation has been made, and I doubt not, assented to, that it cannot be overcome by allowing to the certificate the transferable quality and immunity which belong to negotiable paper. Unless these conclusions can be overthrown, they are subversive of the entire ground of action.
*593 The notion of estoppel, which has been advanced in the -argument, not as a distinct ground of liability, but blended with other principles, deserves by itself very little consideration. Every corporate, as well as private, obligation or instrument, undoubtedly, contains an express or implied representation of facts, upon the faith of which innocent parties may deal. If it be a promissory note, value received is a fact expressed or implied, and, although the fact may not be so, the maker is bound to pay the obligation in the hands of an innocent third party, not upon any theory of estoppel, but upon principles peculiar to that species of security. Where the instrument is not negotiable, the maker may, as I have heretofore observed, be affected by an estoppel in pais, if it be transferred upon his representation of its validity, and the dealer acts upon that representation. But to say that he is es-topped by the instrument itself, simply because he made it, and a third party has dealt with it, is only asserting in another form, that fraud, mistake, duress, illegality, want of consideration, or want of authority, when the act is one of pretended agency, is not denied. This would subvert the settled maxim, that the assignee or purchaser takes subject to all equities between the original parties. It would also subvert another maxim which belongs to the doctrine of estoppel itself. That maxim is, that an admission or representation is no estoppel in favor of a stranger to whom it is not made, and whose conduct it was not expressly designed to influence. (3 John’s cases, 101; 6 Hill, 534; 3 id. 215; 7 Barb. 644.) The result is, that before the principles of estoppel can be applied to this controversy, it must be asserted and proved, that a certificate of stock, differing from all other modes and forms of obligations used in the transactions of men, contains within itself a representation or admission of facts, which any dealer, however remote from the original parties, may accept as addressed to himself, and intended to influence Ms conduct. Eor such a doctrine no authority has been cited, and it had no foundation in any principle Mtberto recognized.
As I have once mentioned, a theory of the action prominently urged upon the argument assumed that the corporation had no power to create more than the original three millions of stock, or to issue certificates for a greater amount. That this is so I think I have demonstrated. But, assuming these premises, it was then *594 insisted that the certificate in question was therefore false, and that the action would lie on this ground. The essential principle of the case, in this view, would be, that, as the defendants, for want .of corporate powers, cannot recognize the certificate as the true representation of stock, and so respond to the engagement which it implies, they must make compensation in damages for the injury sustained, in consequence of the representation regarded as false. .
Now, by presenting the falsehood alleged in the certificate, and the consequent injury as the ground of the action, a plausible appearance is given to this view of the case. But it is essentially illogical. The falsehood, viewed in this aspect alone, really consists in a want of corporate power to enter into the engagement, and that, instead of being a cause of the action, is a serious difficulty to be removed. If an agent, irrespective of all questions arising out of the special limitations of his own authority as derived from the board of directors, cannot bind a corporation, or affect the rights of its genuine stockholders, by the terms of an over-issued certificate, there is great difficulty in affirming that the result may be indirectly reached by thus changing the ground of liabiliiy. If a corporation has received the benefit of its agent’s misrepresentation or fraud, in a transaction unauthorized by its charter, I will not say there is no mode of redress. I am not an advocate of the doctrine that a corporation cannot be responsible' for a wrong, or may not in some form be liable, when its agents enter into engagements which its charter forbids, and the benefits of the transactions can be traced to its stockholders, or are held for their benefit. But such is not the case before us. The stockholders of this corporation are in nowise connected with the misconduct of their agent, nor have they been benefited by it. It is true they trusted him, but it is not alleged that they had not ample reasons for so doing. Conceding that Schuyler’s authority, derived from his appointment as transfer agent, by the board of directors, might apparently include his fraudulent acts, the difficulty is only removed one step further back. The directors themselves were not the corporation, but its agents only. It may be granted that they wielded all the corporate powers, but among those powers the one in question is nowhere to be found. It did not even have an apparent existence. The argument con *595 cedes this absolute want of power, and I have yet to discover the principle on which the genuine stockholders can be made liable in any form, for an attempt to exercise it by any of their agents for their own individual benefit.
But such a point need not be determined. Before reaching this hltimate question thé action fails, upon the special grounds which have been examined at large. Conceding to the defendants the power, if they so elect, to recognize and perform the obligation under which their agent attempted to place them, then, if they are not liable upon their refusal to do so, for the reasons which have been stated, it is extremely plain they are not if the power to do so is wanting. To say that their agent’s false representation of stock, which did not, and could not exist, can render them liable to dealers in the spurious certificates, when they would not be bound to recognize the same dealers, if the stock, in fact, existed, and the representations were therefore true, involves a fallacy so evident that it needs only to be suggested. This is the error in the argument which places the defendants’ liability on the simple ground that the certificate is a fraudulent representation of non-existing stock, the alleged fraud consisting in the statement of that falsehood alone. In this view of the controversy, the other fatal objections to the actions are overlooked. If I have been successful in showing that the plaintiffs can have no title to the shares of stock mentioned in the certificate, for the particular reasons which have been given, then, manifestly, the non-existence of the shares, or the false assertion of their existence, is no ground of complaint.
In concluding, it is proper to say, that the case of The Bk. of Kentucky v. The Schuylkill Bk., (Parsons’ Select Eq. Cases, 180,) has not been overlooked. That case has been much relied on as an authority in point, upon the general question before us, and it is certainly true that, in the opinion delivered on pronouncing the judgment, some principles were stated scarcely reconcilable with the conclusion to which we have come. In that case, however, the suit was brought by the corporation against its own fraudulent agent, after it had recognized the spurious issue under an enabling act of the Legislature; and in many essential circumstances the controversy differed from the present one. After a careful consideration, we are unable to yield to that decision any *596 controlling influence upon tRe question now to Re determined. We are all of opinion, tRat tRe judgment sRould be reversed and a n.ew. trial granted. Ordered accordingly.