GEORGE S. HAZARD AND FRANK W. FISKE, Respond-ents, *v.* JOSIAH M. FISKE, GEORGE W. SMITH AND ARTHUR D. FISKE, Appellants.

*Factors' act — chapter 179 of 1830 — construction of.*

Section 1 of the factors' act (1830, chapter 179) providing that every person, in whose name any merchandize shall be shipped, shall be deemed the true owner, so far as in certain cases to give the consignee a lien thereon for advances made by him, only applies to those cases in which the owner consents to the shipment being made in the name of a third person.

The mere neglect of the true owner to fortify his position, by taking all precautions against a fraud upon his rights and title, is not equivalent to a voluntary consent on his part to the sale or other disposition of the property by a person who assumes to control it for such purposes under color of a fraud.

Section 3 of the said act, protecting persons dealing with " any factor or other agent *entrusted* with the possession of any bill of lading," etc., does not apply to those cases in which the possession of the goods, or of the evidences of the title thereto, is obtained in hostility to the right, and without the consent of the owner.

Appeal from a judgment in favor of the plaintiffs, entered upon the verdict of a jury, and from an order denying a motion for a

new trial, made upon the minutes of the justice before whom the action was tried.

*William H. Green*, for the appellants.

*Sherman S. Rogers*, for the respondents.

TALCOTT, P. J. :

This is an appeal from a judgment rendered at a circuit in Erie county on the verdict of a jury in favor of the plaintiff, and also from an order entered denying a new trial on the minutes.

The facts present one of the cases in which Ozias L. Nims, a grain speculator in Buffalo, had obtained the possession of 18,503 bushels of corn in fraud of the rights of the plaintiffs, who had advanced money upon the bill of lading to enable Nims to pay a draft from Chicago, which came to Buffalo attached to the bill of lading of the corn, issued at Chicago by the master of the schooner Czar. Several similar cases have appeared in the courts under various aspects and involving different questions, some of which are reported as follows : (*M. and T. Bank* v. *Farmers and Mechanics' Bank*, 60 N. Y., 40; *Marine Bank* v. *Fiske*, 71 id., 353; *Farmers and Mechanics' Bank* v. *Erie R. R. Co.*, 72 id., 188.)

It appears in substance in this case that Nims (who was in partnership with David Long), doing business under the name and style of "O. L. Nims, agent," had directed one J. B. Lyon, who was the agent of Nims at Chicago, to purchase for the firm of O. L. Nims, agent, 24,000 bushels of corn, which Lyon did, and shipped the same on the schooner Czar, on account of said Lyon, to the care of O. L. Nims. To raise the money at Chicago to pay the price of the corn, Lyon drew his draft on O. L. Nims for $12,610.59, payable to the order of the cashier of a bank in Chicago, attached the same to the bill of lading issued by the master of the Czar. Lyon delivered the bill of lading, with the draft attached, to the said bank, which discounted it, and sent the draft with the bill of lading forward to a bank at Buffalo for collection. The draft and bill of lading arrived at Buffalo on the 30th day of October, 1871, and on that day the plaintiffs, also grain dealers at Buffalo, at the request of Nims, and as a loan or advance on

the cargo of the Czar, loaned to Nims $12,600, with the agreement that they should hold the bill of lading as collateral security for the repayment of the money, and took from Nims a receipt and agreement as follows:

"BUFFALO, *October* 30, 1871.

" Received of G. S. Hazard & Co., $12,600 advance on 2400 bushels corn. Schooner Czar. Bill of lading held as collateral. $12,000."

"O. L. NIMS, *Agent.*

"Per LEWIS M. EVANS."

At the time the receipt was given the bill of lading and certain certificates, evidencing the fact that the said cargo was insured, were handed to Hazard & Co., and they gave Nims the $12,600 by their check.

The bill of lading was indorsed by " O. L. Nims," and by " O. L. Nims," agent.

The schooner Czar, with its cargo, arrived at Buffalo on the seventh or eighth of November following the transfer of the bill of lading. According to the custom and ordinary course of business, the master of the schooner would seek out the person to whose care the cargo was consigned, and deliver it to him, or put it into such elevator as he should direct, and there was a custom amongst grain dealers at Buffalo that when advances were made on a cargo of grain and the bill of lading assigned, the consignee should procure the elevators warehouse receipt in the name of the person to whom the bill of lading was assigned, and the assignee generally intrusted the performance of that duty to the general owner of the grain, though, in some instances, those who had made advances on cargoes gave notice to the proprietors of the elevator that the warehouse receipt must be made out to the party to whom the bill of lading was assigned. In this instance the master, having notified Nims of the arrival of the cargo, was directed by the latter, with the assent of the plaintiffs, to deliver the cargo into an elevator known as the " city elevator," and he did so, taking a warehouse receipt, known as an " elevator ticket," for the same. The master then took the " elevator ticket " to the office of the " Western Elevating Company," who then had charge

of the running of several elevators in Buffalo, and procured the warehouse receipt of the Western Elevating Company for the said cargo of corn, by the indorsement and delivery of the "elevator ticket" to the company, which warehouse receipt certified that said company had received said cargo in store, subject to the order of O. L. Nims.    This warehouse receipt the master took to the office of Nims, and delivered to him on being paid his freight.

By some neglect or inadvertence the plaintiffs never got possession of the warehouse receipt, and Nims, without the consent or knowledge of the plaintiffs, being enabled by means of the warehouse receipt delivered to him by the master, caused the corn to be shipped on four canal boats, after mixing it with other corn belonging to him consigned to the defendants, constituting the firm of "J. M. Fiske & Co.," commission grain dealers in New York, and obtained from the master of each of said canal boats a canal shipping bill or bill of lading, consigning the corn embraced in that cargo to the care of said J. M. Fiske & Co., New York, and drew his draft on J. M. Fiske & Co., against each of the said canal cargoes, attached the draft in each case to the canal shipping bill, and procured the several drafts to be discounted at some one of the Buffalo banks and received the money.

The said several drafts were sent to New York for collection, and were presented to and paid by said J. M. Fiske & Co., without any notice of any claim on the part of the plaintiffs to the said corn or any part thereof.

Thus it appears that by the neglect of the plaintiffs to give notice to the elevating company that they (the plaintiffs) were the assignees of the bill of lading for the corn shipped on board the Czar, or seeing to it that the warehouse receipt was issued in the name of the plaintiffs or delivered to the plaintiffs, Nims was enabled, tortiously and fraudulently, to get the actual possession of the corn, and to obtain from the defendants, Fiske & Co., an advance thereon of nearly the full value thereof, and the question presented by the case is, whether, by the neglect of the plaintiffs to take any of the precautions specified, they have been deprived of their title to the corn, and are debarred and estopped from reclaiming the same as against J. M. Fiske & Co., by the factors' act or otherwise.

The plaintiffs, by the indorsement and delivery of the bill of lading of the schooner Czar for a valuable consideration, became, in judgment of law, the possessors of her cargo of corn, as the pledgees of Nims, the general owner. The transfer of the bill of lading transferred the possession of the cargo, and the possession of the carrier thereafter became the possession of the plaintiffs, who thus became the pledgees and special owners thereof. (*Manuf. and T. Bk.* v. *Farmers and M. Bk.*, 60 N. Y., 40; *Marine Bk.* v. *Fiske*, 71 id., 353.)

The general owner had not the possession or the right to the possession, or to dispose of, or to control the corn. Any possession which he might obtain or dominion he might exercise over it, without the assent of the plaintiff, would have been tortious, and he could transfer no title to another. (*Marine Bk.* v. *Fiske*, 71 N. Y., 357, and cases cited.)

It is quite apparent, then, that, as between the plaintiffs and Nims, the latter did not and could not acquire any title to the cargo by neglecting to take out the receipt of the elevating company in the name of the plaintiffs, or by omitting to hand it over to the plaintiffs, which good faith and the customary mode of transacting that kind of business required Nims to do, and the only remaining question is whether Fiske & Co. acquired a title to the corn as against the plaintiffs, by having in good faith advanced on the corn contained in the canal boat cargoes. The statute known as the "Factors' act" (Laws of 1830, chap. 179) provides in the first section thereof that every person, in whose name any merchandize shall be shipped, shall be deemed the true owner thereof, so far as to entitle the consignee of such merchandize to a lien thereon. 1. For any money advanced or negotiable security given by such consignee, to or for the use of the person in whose name such shipment shall have been made. But it has been held in various cases that this applies only to cases where the shipment in the name of another person is made by, or with the consent of the owner. (*Covill* v. *Hill*, 4 Den., 323; *First Nat. Bk. of Toledo* v. *Shaw*, 61 N. Y., 283; *Saltus* v. *Everett*, 20 Wend., 267.) The third section of the Factors' act provides: "Every factor or other agent *intrusted* with the possession of any bill of lading, custom house permit or warehouse keepers' receipt for the

delivery of any such merchandize, and every such factor or agent not having the documentary evidence of title, who shall be intrusted with the possession of any merchandize for the purpose of sale, or as a security for any advances to be made or obtained thereon, shall be deemed to be the true owner thereof, so far as to give validity to any contract made by such agent with any other person, for the sale or disposition of the whole or any part of such merchandize, for any money advanced, or negotiable instrument, or other obligation in writing, given by such other person upon the faith thereof."

This third section also contemplates that the party who has assumed to act in disposing of the merchandize should have been "*intrusted*" with the possession of the documentary evidences of title, or with the goods themselves, for the purpose of sale, etc., and does not extend the protection of the act to cases in which the possession of the goods or evidence of title thereto shall have been obtained in hostility to the right and to the consent of the owner.

It appears to be well settled that unless the usual indicia of ownership have been conferred upon the party who assumes to sell, dispose of, or consign the merchandize, by the true owner, or with his consent, such owner is not prevented from pursuing his title, even as against a *bona fide* purchaser or lienor. (*Barnard* v. *Campbell*, 55 N. Y., 456; *Ballard* v. *Burgett*, 40 id., 314; *Austin* v. *Dye*, 46 id., 500; *Dows* v. *Perrin*, 16 id., 325.)

It does not appear that the plaintiffs had any knowledge that the master of the Czar had taken the warehouse receipt in the name of Nims, or that Nims had retained the possession of it. On the contrary, it appears that the plaintiff supposed the warehouse receipt, which had been taken, was in their safe and in their possession, until after the fraud upon them had been perpetrated by Nims.

None of the cases, so far as we have been able to examine them, hold that the neglect of the true owner to fortifying his position, by the taking of all precautions against a fraud upon his rights and title, would be equivalent to a voluntary consent on his part to the sale or other disposition of the property by a person who should assume to control it for such purposes under color of

a fraud which, at all events, so far as its moral qualities are concerned, amounted to a larceny of the corn. In the case of *Voorhis* v. *Olmstead* (66 N. Y., 113), the plaintiff had voluntarily consented that the warehouse men should give the warehouse receipt to Biddle & Co., as owners, and thus invested them with the possession and the usual documentary evidence of title, and it was this voluntary consent which enabled the warehouse and security company to hold a lien for its advances.

True, the defendants claim that what passed between Nims and one of the plaintiffs, about the time of the arrival of the cargo, amounted to a consent that Nims should sell or ship the corn, or should take it into his possession, but the conversations referred to are easily explained upon the idea that they were based on the assumption that before any of these things were to be done Nims was, as in former instances, to reimburse the plaintiffs for the advance of the $12,600. And the jury have, by their verdict, found in effect that the plaintiffs did not consent that Nims should take any possession of the corn without payment of their advances. The various requests of the defendants' counsel to charge were, in effect, to instruct the jury upon the evidence in the case, as matter of law, that the defendants were entitled to recover, and would have been erroneous if we are correct in the view we have taken of the case.

As to the conversion, it was sufficiently shown that the defendants had sold the corn before the commencement of the suit.

On the whole, in regard to the rights of the respective parties, we cannot distinguish this case in principle from the case of *The Marine Bank* v. *Fiske* (71 N. Y., 353), where it was held that " the owner of property, which has been tortiously taken from him, is not estopped from reclaiming it by the fraudulent act of the tortious taker, to which he was not a party, and which he in no way aided ; to create an estoppel he must have enabled the wrongdoer to perpetrate the fraud."

The judgment and order denying a new trial are affirmed.

SMITH and HARDIN, JJ., concurred.

Ordered accordingly.